# LACKEY HERSHMAN

### A LIMITED LIABILITY PARTNERSHIP

3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4241
Phone: (214) 560-2201
Fax: (214) 560-2203
www.lhlaw.net

April 18, 2005

**VIA FEDERAL EXPRESS**

Ms. Joan Davenport
Appellate Clerk
515 Rusk
Room 1217
Houston, Texas 77002

*CA-05- 1073* ✓
*Melinda Harmon*

Re:   *Highland Capital Management, L.P., et al. v. Chesapeake Energy Corporation and Robert A. Hefner, III,* Adversary No. 04-3370

Dear Ms. Davenport:

Accompanying this letter you will find Appellants' Designations for the Record in the appeal of the above-referenced adversary to the District Court. Appellee's Designations are being sent to you in a separate box.

If you have any questions, please feel free to give me a call at (214) 560-2213.

Thank you for your attention to this matter

Very truly yours,

LACKEY HERSHMAN, L.L.P.

*Edward J. Szymanski Jr.*

Edward J. Szymanski, Jr.

Enclosures

cc:   Paul E. Heath, Esq. (via facsimile w/o enclosures)



United States Courts
Southern District of Texas
FILED

APR 1 9 2005

Michael N. Milby, Clerk

# ADVERSARY NO. 04-3370

# APPELLANTS'
# DESIGNATION OF RECORD
# TAB NO. 1

Tab 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
FEB 2 7 2004

Michael N. Milby, Clerk

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., ML CBO IV (CAYMAN) LTD., PAMCO CAYMAN, LTD., and PAM CAPITAL FUNDING, L.P., | § § § § § | H-04-0787 |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO._____ |
| CHESAPEAKE ENERGY CORPORATION, | § § § | |
| Defendant. | § § | |

## NOTICE OF REMOVAL

Defendant Chesapeake Energy Corporation (the "Removing Defendant") hereby gives notice of the removal (the "Notice of Removal" or "Removal") pursuant to 28 U.S.C. §§ 1334 and 1452 and FED. R. BANKR. P. 9027, of any and all claims and causes of action asserted against the Removing Defendant in Cause No. 2003-39194 pending in the 234th Judicial District Court of Harris County, Texas, to the United States District Court for the Southern District of Texas, Houston Division.[1] As grounds for this Removal, the Removing Defendant respectfully submits the following:

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### The Removed Action

1.    This action was originally filed by Highland Capital Management, L.P., ML CBO IV (Cayman) Ltd., Pamco Cayman, Ltd. and Pam Capital Funding, L.P. (the "Plaintiffs") against Defendant Ryder Scott Company ("Ryder Scott"). The action was

---

[1] The Removing Defendant is not removing any claims and causes of action asserted against Defendants Ryder Scott Company or Robert A. Hefner III.

pending under Cause No. 2003-39194 in the 234th Judicial District Court for Harris County, Texas (the "Texas State Court").

2.     This action was amended to include allegations against the Removing Defendant on or about November 21, 2003, by the filing of Plaintiffs' First Amended Original Petition (the "Amended Petition") in the Texas State Court. Copies of the Amended Petition and the accompanying Summons (the "Summons") are attached hereto as **Exhibit A**. The Plaintiffs assert that they served the Texas Secretary of State as the Removing Defendant's alleged agent for service of process with the Petition and Summons on January 29, 2004.

3.     The Plaintiffs' claims allegedly arise out of their purported acquisition of certain Senior Subordinated Notes (the "Notes") issued by Seven Seas Petroleum, Inc. ("Seven Seas" or the "Debtor"). In the Amended Petition, the Plaintiffs generally allege that the Removing Defendant was involved in a conspiracy to defraud all holders of the Notes. *Petition*, p. 16, ¶¶ 55-59. The Removing Defendant denies all allegations in the Amended Petition.

### The Bankruptcy Case

4.     On or about December 20, 2002 (the "Petition Date"), certain holders of the Notes (including the Plaintiffs) filed an involuntary petition (the "Involuntary Petition") against Seven Seas under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the Case No. 02-45206-H2-11 entitled *In re Seven Seas Petroleum, Inc.* (the "Bankruptcy Case") in the United State Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). The Involuntary Petition is attached hereto as **Exhibit B**.

**R 2**

5.    On January 13, 2003, the Debtor consented to the entry of an order for relief and converted the case to a case under chapter 11 of the Bankruptcy Code. *See Notice of Commencement of Case Under Chapter 11 of the Bankruptcy Code, Meeting of Creditors, and Fixing of Dates*, a copy of which is attached hereto as **Exhibit C**. Ben Floyd was appointed chapter 11 trustee to the Debtor's bankruptcy estate by order of the Bankruptcy Court dated January 14, 2003.

6.    On August 4, 2003, the Bankruptcy Court entered the Order Confirming Chapter 11 Trustee's Second Amended Plan of Reorganization for Seven Seas Petroleum, Inc. (the "Confirmation Order") and thereby confirmed the Chapter 11 Trustee's Second Amended Plan of Reorganization for Seven Seas Petroleum, Inc. (the "Plan"). A copy of the Confirmation Order is attached hereto as **Exhibit D** (the Plan is annexed as an exhibit to the Confirmation Order).

7.    A final decree has not yet been entered in the Bankruptcy Case. Accordingly, the Bankruptcy Case remains open and pending.

### Relevant Provisions of the Plan and Confirmation Order

8.    The causes of action asserted by the Plaintiffs in the Amended Petition against the Removing Defendant allege injury to all holders of the Notes; and, therefore such claims are general and derivative in nature and property of the Debtor's bankruptcy estate under 11 U.S.C. § 541. *Schimmelpennick v. Byrne (In re Schimmelpennick)*, 183 F.3d 347 (5th Cir. 1999). The Removing Defendant was granted a release under the Plan and Confirmation Order from any and all claims and causes of action held by the Debtor's bankruptcy estate including the claims asserted by the Plaintiffs against the Removing Defendant in the Amended Petition. *See Plan*, p. 20-21, Article 8.2.k; *Confirmation Order*, p. 3, ¶ 9.

**R 3**

9.     The Bankruptcy Court has reserved the exclusive jurisdiction to enforce the provisions of its Confirmation Order. *See Confirmation Order*, p. 4, ¶ 18.

## ARGUMENT AND AUTHORITIES

### Removal Procedure

10.     Unanimous consent of all defendants is not required for removal under 28 U.S.C. § 1452. *Sommers v. Abshire,* 186 B.R. 407, 408 (S.D. Tex. 1995) (finding that "section 1452 of the bankruptcy removal statute permits an individual defendant in a multi-defendant case to remove an action from state court without joinder or consent of the other defendants when the lawsuit contains matters related to a bankruptcy case.").

11.     Removal under FED. R. BANK. P. 9027 is timely so long as it was filed within thirty (30) days of the removing defendant being served. Creasy *v. Coleman Furniture Corp.*, 763 F.2d 656, 660-61 (4th Cir. 1985). Accordingly, this Notice of Removal is timely filed pursuant to FED. R. BANKR. P. 9027(a)(3).

### Bankruptcy Jurisdiction

12.     Removal is proper pursuant to this Court's bankruptcy jurisdiction, as authorized by 28 U.S.C. § 1334(b) (federal district courts have "original jurisdiction of all civil proceedings . . . arising in or related to cases under title 11"). Cases subject to such jurisdiction are removable under the authority of 28 U.S.C. § 1452 ("A party may remove any claim or cause of action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.").

13.     This action "arises in," or alternatively, is "related to" the Bankruptcy Case that is now pending in the Bankruptcy Court. The Fifth Circuit has described a matter as "arising in" title 11 of the United States Code when the claim would not exist outside of

bankruptcy. *U.S. Brass Corp. v. Travelers Ins. Group (In re Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002). The claims brought by the Plaintiffs are property of the Debtor's bankruptcy estate and were released through the Plan and Confirmation Order. *See Plan*, p. 20-21, Article 8.2.k; *Confirmation Order*, p. 3, ¶ 9. Thus, the commencement of the action squarely collides with the Plan and Confirmation Order. Plans of reorganization and orders confirming such plans go the heart of the Bankruptcy Code because without the Bankruptcy Code such pleadings and orders would not exist. Accordingly, the claims brought by the Plaintiffs are claims that arise in the Bankruptcy Case pursuant to 28 U.S.C. § 1334(b).

14.     The outcome of this action also "relates to" the Bankruptcy case because if the action is pursued, then provisions of the Plan and Confirmation Order will be altered because their provisions are not being enforced. *See also Donaldson v. Bernstein*, 104 F.3d 547, 552-53 (3d Cir. 1997) (describing "related to" jurisdiction to exist where the "outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy"); *Haws v. Graue (In re Haws)*, 158 B.R. 965, 970 (Bankr. S.D. Tex. 1993) (same).

### Core vs. Non-Core Bankruptcy Jurisdiction

15.     "Core" matters are those directly concerning the "restructuring of debtor-creditor relations" and which constitute the "core of federal bankruptcy power." *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982). With core matters, bankruptcy judges are empowered to enter final orders and judgments. 28 U.S.C. § 157(b). This action involves altering the debtor-creditor relationship by the Plaintiffs by pursuing alleged claims that are property of the bankruptcy estate and that have been released under the terms of the Plan and Confirmation Order.     **R 5**

16.    This action involves the administration of the Debtor's estate, the confirmation of a plan and enforcement of such order, and is a proceeding affecting the adjustment of the debtor-creditor or equity security holder relationship and is, therefore, a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and (O).  To the extent the Court determines this action to be a non-core proceeding, the Removing Defendant consents to entry of final orders by a bankruptcy judge.

## NOTICE

17.    Pursuant to FED. R. BANKR. P. 9027(b), all Plaintiffs and non-removing Defendants are being served with this Notice of Removal per the attached Certificate of Service.  Additionally, pursuant to FED. R. BANKR. P. 9027(c), a copy of this Notice of Removal is being filed with the clerk of the District Court of Harris County, Texas.

## PROCESS AND PLEADINGS

18.    True and correct copies of all process and pleadings filed in this action are attached hereto collectively as **Exhibit E** and incorporated herein by reference.

## RESERVATION

19.    No admission of fact, law, or liability is intended by this Notice of Removal, and all defenses, motions, counterclaims, and pleas are expressly reserved.

## PRAYER

**WHEREFORE**, Plaintiffs are hereby notified to proceed no further as against the Removing Defendant in the Texas State Court.

**R 6**

Dated this _____ day of February, 2004.

Respectfully submitted,

**CLEMENTS, O'NEILL, PIERCE,
    WILSON & FULKERSON, L.L.P.**
Wells Fargo Plaza
1000 Louisiana Street, Suite 1800
Houston, TX  77002-5009
Tel:  (713) 654-7600
Fax: (713) 654-7690

w/permission

Jesse R. Pierce, SBT #15995400
S.D. Tex. Admission #472
Designated attorney-in-charge

and

**VINSON & ELKINS L.L.P.**
Paul E. Heath, SBT # 09355050
S.D. Tex. Admission # 24456
Designated of counsel
Holly J. Warrington, SBT # 24037671
S.D. Tex. Admission # 34935
Designated of counsel
2001 Ross Avenue
3700 Trammell Crow Center
Dallas, TX  75201
Tel:  (214) 220-7700
Fax:  (214) 220-7716

**ATTORNEYS FOR THE
REMOVING DEFENDANT**

R 7

## CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of February, 2004, a copy of the Notice of Removal was served by first class United States mail to the following:

Paul B. Lackey
Michael P. Aigen
Edward J. Szymanski, Jr.
Lackey Hershman, L.L.P.
3102 Oak Lawn Avenue, Ste. 700
Dallas, TX  75219-4241
*Counsel for the Plaintiffs*

Jeffrey R. Elkin
Porter & Hedges, LLP
700 Louisiana, 25th Floor
Houston, TX  77002-2764
*Counsel for Defendant*
*Ryder Scott Company*

Robert A. Hefner, III
Huntingdon Condominiums
2121 Kirby Drive, No. 13 SW
Houston, TX  77019
*Defendant*

_____
One of Counsel

804399_2
CHE759/67000

**R 8**

Tab 1
Exhibit (A)

# **<u>Exhibit A</u>**

M' CHARLES BACARISSE ░░
District Clerk

NOV 2 1 2003

:... County, Texas

By _____
                              Deputy

CAUSE NO. 2003-39194

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., ML CBO IV (Cayman) LTD., PAMCO CAYMAN, LTD., PAM CAPITAL FUNDING, L.P., | § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| RYDER SCOTT COMPANY, CHESAPEAKE ENERGY CORPORATION, and ROBERT A. HEFNER III, | § § § § § | |
| Defendants. | § § | 234th JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

Plaintiffs Highland Capital Management, L.P. ("Highland"), ML CBO IV (Cayman), Ltd. ("ML CBO IV"), Pamco Cayman, Ltd. ("Pamco"), and Pam Capital Funding, L.P. ("Pam Funding") (collectively, "Plaintiffs") file this First Amended Original Petition against Defendants Ryder Scott Company ("Ryder Scott"), Chesapeake Energy Corporation ("Chesapeake Energy") and Robert A. Hefner III ("Hefner") on personal knowledge as to all matters regarding themselves was and on information and belief as to all other matters, as follows:

### I.

### PRELIMINARY STATEMENT

In July 2001, the investment community believed that Seven Seas Petroleum, Inc. ("Seven Seas") had proved oil reserves conservatively estimated at 47.9 million barrels of oil with a discounted present value exceeding $ 394 million. The reason for this belief was because Ryder Scott, one of the largest, oldest and most respected reservoir-evaluation consulting firms in the petroleum industry, had prepared the reserve estimates using SEC parameters that confirmed

R 10

these facts.  What the investment world did not know, however, was that in preparing these reserves estimates, Ryder Scott had strayed so far from the SEC requirements for the calculation of reserves that Ryder Scott's reserve reports could only be described as reckless or even fraudulent.  Furthermore, it appears that Seven Seas and certain other parties, including Defendants Chesapeake Energy and Hefner, were aware in July 2001 that Ryder Scott's reserve estimates were fraudulent and that Seven Seas' reserve estimates were dramatically lower than those represented in Ryder Scott's reports.  In addition, the fraud regarding Seven Seas' holdings continued into 2002 when Ryder Scott again confirmed that Seven Seas held proved reserves of 47.6 million barrels of oil.  Based upon the representations of Ryder Scott regarding Seven Seas proved reserves, Plaintiffs invested millions of dollars in notes issues by Seven Seas.

In August 2002, however, the unthinkable occurred.  Only a few months after confirming that Seven Seas had proved reserves of 47.9 million barrels, Ryder Scott reevaluated Seven Seas' holdings and reduced what had supposedly been 47.9 million barrels of proved reserves by almost two-thirds -- to approximately 16.3 million.  Amazingly, with the stroke of a pen, Ryder Scott caused 31.6 million barrels of proved reserves to disappear virtually overnight.  And to make matters even worse, what little value was left in Seven Seas after the "writedown" was gobbled up by the parties who had known the true nature of Seven Seas holdings in back in July 2001, parties such as Defendants Chesapeake Energy and Hefner.  This left parties who had invested in Seven Seas notes on the strength of Ryder Scott's reserve reports, such as Plaintiffs, with virtually nothing.  Plaintiffs now bring this lawsuit to recover the damages they have suffered in an effort to rectify the wrongdoing that has been done to them by the Ryder Scott, Chesapeake Energy and Hefner.

II.

PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION                                            PAGE 2

R 11

## DISCOVERY CONTROL PLAN

1.      Pursuant to the Texas Rules of Civil Procedure, Plaintiffs respectfully request that the Court order that discovery should be conducted under Rule 190 (Level 3).

### III.

## JURISDICTION AND VENUE

2.      Jurisdiction is proper in this Court because the amount in controversy exceeds the minimum jurisdictional threshold of this Court and 1) Defendant Ryder Scott Company is a Texas limited liability company which has its principal place of business located in Houston, Texas; 2) Defendant Robert A. Hefner III is an individual residing in the State of Texas, and 3) Defendant Chesapeake Energy Corporation is a foreign corporation that: a) upon information and belief, committed acts in furtherance of the conspiracy to defraud alleged herein within the State of Texas, and b) maintains such substantial, continuous, and systematic contacts with the State of Texas that this Court may exercise general jurisdiction over it.

3.      Venue in this case has been established as a result of a Motion To Transfer Venue filed by Defendant Ryder Scott Company and ruled upon by the 162nd Judicial District Court for Dallas County, Texas.  The bases for Defendant Ryder Scott Company's Motion To Transfer Venue were that, pursuant to §15.001(a) of the Texas Civil Practice & Remedies Code, venue is proper in Harris County because all or a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in Harris County and/or Defendant Ryder Scott Company maintains its "principal office" in Harris County.

### II.

## THE PARTIES

PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION                                         PAGE 3

4.     Plaintiff Highland is a Delaware limited partnership with its principal place of business in Dallas, Texas. Highland is the fund manager for the Plaintiffs described below.

5.     Plaintiff ML CBO IV, a Cayman Island LLC with its principal place of business in George Town, Grand Cayman Islands, owns approximately $5 million of the Seven Seas' notes (the "Notes").

6.     Plaintiff Pamco, a Cayman Island LLC with its principal place of business in George Town, Grand Cayman Islands, owns approximately $4.5 million of the Notes.

7.     Plaintiff Pam Capital Funding, a Cayman Island LLC with its principal place of business in George Town, Grand Cayman Islands, owns approximately $8.037 million of the Notes.

8.     Defendant Ryder Scott Company ("Ryder Scott") is a Texas limited liability company with its principal place of business located at 1100 Louisiana, Suite 3800, Houston, Texas 77002-5218. Defendant Ryder Scott has filed its answer and entered a general appearance in this case.

9.     Defendant Chesapeake Energy Corporation ("Chesapeake Energy") is an Oklahoma corporation. Pursuant to CPRC §§17.042, 17.044 and 17.045, Chesapeake Energy may be served with process by serving duplicate copies of process upon the Texas Secretary of State as its agent for service at 1019 Brazos Street, Austin, Texas 78701, Travis County because Chesapeake Energy is a nonresident who: 1) has engaged in business in this state by committing a tort in whole or in part in this state, but who does not maintain a regular place of business in this state or a designated agent for service of process in this state and this proceeding arises out of the business done in this state and to which Chesapeake Energy was a party, and 2) is not required to designate an agent for service in this state, but has become a nonresident after a cause of action

PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION                                    PAGE 4

arose in this state but before the cause was matured by suit in a court of competent jurisdiction. Pursuant to CPRC §17.045, the secretary of state shall mail a copy of the process, by registered mail or by certified mail, return receipt requested, to Chesapeake Energy's principal office at the following address: Chesapeake Energy Corporation, 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118.

10.    Defendant Robert A. Hefner III is an individual residing in the State of Texas who may be served with process at the following address: Robert A Hefner III, Huntingdon Condominiums, 2121 Kirby Drive, No. 13 SW, Houston, Texas 77019.

## V.

## FACTS APPLICABLE TO ALL COUNTS

A.    Through 2001, It Looked Like "Smooth Sailing" With Seven Seas.

11.    Seven Seas Petroleum, Inc. ("Seven Seas") is an independent oil and gas company that, prior to its bankruptcy in December 2002, was engaged in the exploration and development of oil and gas properties located in Colombia, South America.

12.    Since its original incorporation in 1995, Seven Seas had undergone a steady migration in its operational focus. Its original mission was to participate as a non-operator with small working interests in high potential oil and gas exploration ventures outside of North America. In late 1995 and early 1996, however, Seven Seas participated in the El Segundo1-E, the well that discovered the Guaduas Oil Field, located about 60 miles northwest of Bogata in Colombia's reserve-rich Magdalena Basin. In July 1996, Seven Seas increased its working interest in the Guaduas Oil Field from 15% to 51.7% through the acquisition of some of its working interest partners. At that time, Seven Seas also became the operator of the Guaduas Field, thus assuming all responsibilities for the exploration, development, and production from

PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION                                    PAGE 5

R 14

this field. During 1996 and 1997, Seven Seas drilled six delineation wells to determine the size of the Guaduas Field. Four of these wells proved to be successful oil producers. In March 1997, Seven Seas increased its working interest in the Guaduas Field to 57.7% by purchasing yet another of its working interest partners.

13.   In January 1998, shares of Seven Seas began trading on the American Stock Exchange. At that time, Seven Seas became required to report its reserve estimates in its filings with the United States Securities & Exchange Commission's ("SEC") using the definitions of proved reserves found in Rule 4-10(a) of Regulation S-X of the Securities Exchange Act of 1934.

14.   The reservoir-evaluation consulting firm selected by Seven Seas to prepare its proved reserve estimates using these SEC parameters was Defendant Ryder Scott. Ryder Scott is one of the largest, oldest and most respected reservoir-evaluation consulting firms in the petroleum industry. It is the most widely used consulting firm for preparing year-end reserve estimates in accordance with SEC guidelines. The first reserve report that Ryder Scott prepared for Seven Seas using SEC parameters was for year-end 1997.

15.   In April 1998, Seven Seas issued $110 million of 12.5% senior subordinated notes (the "Notes") to fund the expansion of its operations in Colombia. It was Ryder Scott's reserve reports that investors looked toward when Seven Seas made its initial offering of the Notes. Under the business practices existing at all times relevant to this lawsuit, Ryder Scott knew or should have known that its proved reserve estimates for Seven Seas would be examined and relied upon by a limited class of persons, namely the discreet group of large financial institutions that invested in high-yield notes. Indeed, Ryder Scott gave permission to Seven Seas to include its proved reserve estimates in Seven Seas' 10-K filings for year-end 2000 and year-end 2001.

16.     By August 2000, Seven Seas started its post-exploration phase production of the Guaduas Oil Field, producing between 4,000 and 6,000 barrels of oil per day and trucking this production to nearby refineries. In May 2001, Seven Seas commenced a nine-well development drilling program for the Guaduas Oil Field. In July 2001, Seven Seas completed a 40-mile pipeline connecting the Guaduas Field to Colombia's existing pipeline infrastructure.

17.     On April 2, 2001, Seven Seas filed its Form 10-K for the year ending December 31, 2000. In that 10-K, Seven Seas reported that Ryder Scott had estimated that the total net proved reserves for Seven Seas' interest in the Guaduas Oil Field were 47.9 million barrels of oil, having a discounted net present value exceeding $394 million. At this time, Ryder Scott knew or should have known that each year-end reserve estimate it produced for Seven Seas would be relied upon by potential investors in the Notes and investors in the Notes in making their decisions to acquire and/or hold their investments in Seven Seas' Notes.

18.     Thus, in mid-year 2001, all looked very promising for those contemplating an investment in Seven Seas' Notes. There was one crucial fact, however, about which the investing community was not aware. In preparing the reserve estimates that were contained in Seven Seas' 10-K, Ryder Scott had not faithfully applied the parameters set forth by the SEC for the calculation of proved reserves. In fact, in preparing Seven Seas' reserve estimates, Ryder Scott had strayed so flagrantly far from the SEC parameters that Ryder Scott's reserve estimates constituted such a reckless abandonment of truth that they could only be described as fraud. Ryder Scott had reported vast areas of the Guaduas Field as containing proved reserves when, in reality, Ryder Scott knew these reserves had not been proved under the SEC's guidelines and Ryder Scott had no idea whether these reserves existed or could ever be commercially developed.

B.     In July 2001, Seven Seas Issues Senior Secured Notes To Fund The Drilling of The Deep Wildcat Well – The Escuela No. 2.

19.     In light of the fact that as of mid-2001 Seven Seas' reserve estimates were vastly overstated and Ryder Scott certainly knew this, a central question becomes: Who else besides Ryder Scott also knew that Seven Seas didn't have the proved reserves represented in Seven Seas' 10-K?

20.     In July 2001, events transpired that provide important insight into an answer to that question.  For around this time, Seven Seas began to take actions to explore an area of the Guaduas Oil Field known as the Subthrust Dindal prospect or the Deep Dindal.  Seven Seas had acquired the rights to the Deep Dindal in January 2001 by agreeing to pay 100% of the costs of the first exploration well.  The Deep Dindal was located below the known productive region of the Guaduas Oil Field.  Seven Seas believed that the subthrust exploration well would test one of the largest undrilled geological structures in a known prolific petroleum province in the entire Western Hemisphere.  It was believed that the Deep Dindal prospect could contain as much as a billion barrels of oil.  Because the well targeting this area, which became known as the Escuela No. 2, would need to be approximately 15,000 feet in depth, it was believed that it would take around six months to drill and cost approximately $15 million.

21.     In order to fund the drilling of the Escuela No. 2 and finance Seven Seas business operations for 2002, Seven Seas issued 12% Senior Secured Notes (the "Secured Notes").  Under the terms of the already-existing Notes, Seven Seas was allowed to incur a senior, secured indebtedness in an amount that did not exceed the greater of (1) $25 million or (2) the sum of 100% of cash, plus 100% of receivables from a Colombian governmental organization know as Ecopetrol and 30% of the discounted net reserves from proved oil and gas reserves.  In July 2001, Seven Seas' cash totaled $11.8 million and the Ecopetrol receivables totaled $4.5 million.  The discounted net receivables from proved reserves, however, were the $394.1 million figure

provided in the Ryder Scott reserve reports. Thirty percent (30%) of this figure was $118.2 million. Thus, the total amount of secured debt which Seven Seas could have created was $134.4 million. The amount of secured debt that Seven Seas created, however, was limited to $45 million. Without the discounted net value for proved reserves contained in Ryder Scott's report, Seven Seas would have been limited to only $25 million. With the Ryder Scott reports, Seven Seas could have issued $134.4 million. Seven Seas chose to issue $45 million. Of the $45 million generated by the sale of the Secured Notes, $15 million was escrowed for the drilling of the Escuela No. 2.

22.     The Secured Notes were issued with detachable warrants that enabled the purchasers of the Secured Notes to potentially acquire millions of shares of common stock in Seven Seas for $1.78 per share. Half of the Secured Notes (i.e., $22.5 million) were purchased by Defendant Chesapeake Energy. Chesapeake Energy is an independent oil and gas producer which, as of December 2002, had interests in over 10,000 wells, of which it operated approximately 4,600. Needless to say, it has considerable experience in the field of oil and gas operations. It also has an interesting tie to Seven Seas in that Ronald A. Lefaive, Seven Seas' Vice-President of Finance, CFO and Secretary during 2001 had previously served as the Senior Vice-President of Accounting, Controller and Chief Account Officer at Chesapeake Energy from 1993 to 1999.

23.     The remaining half of the Secured Notes was purchased by a qualified group of investors led by Defendant Hefner. During 2001, Hefner was Chairman and CEO of Seven Seas. Hefner personally purchased $15 million of the Secured Notes.

24.     The net effect of the issuance of the Secured Notes by Seven Seas was clear. The purchasers of Secured Notes had little-to-no downside of losing their investment because their

interests were secured and had priority over any claim that could be asserted by the investors in the already-existing subordinated 12.5% Notes. The upside to the purchasers of the Secured Notes was mind staggering because if the Escuela No. 2 contacted the reserves that Seven Seas believed existed in the Deep Dindal the owners of the Secured Notes could exercise their warrants and purchase a significant equity position in a company that would then have reserves in excess of a billion barrels of oil for an extremely modest $1.78 per share.

25.     In December 2001, Seven Seas began drilling the Escuela No. 2.

**C.    In Reliance Upon The False Appearance Created By Ryder Scott's Reserve Reports, Plaintiffs Invest In Seven Seas' Notes.**

26.     In reliance upon the figures set forth the Ryder Scott reserve reports that were contained in the 10-K filed by Seven Seas for year-end 2001, Plaintiffs purchased interests in the Seven Seas' 12.5% Notes in the following amounts on the following dates:

| Date | Purchaser | Amount |
|------|-----------|--------|
| January 9, 2002 | Pamco Cayman | $ 3,000,000.00 |
| January 9, 2002 | ML CBO IV | $ 3,000,000.00 |
| January 9, 2002 | Pam Capital | $ 3,927,000.00 |
| January 11, 2002 | ML CBO IV | $ 1,500,000.00 |
| February 27, 2002 | Pam Capital | $ 2,000,000.00 |
| April 2, 2002 | Pam Capital | $ 1,610,000.00. |

27.     The false picture that Ryder Scott was painting regarding Seven Seas' proved reserves continued into 2002. On April 16, 2002, Seven Seas filed its Form 10-K for the year ending December 31, 2001. On that date, Seven Seas reported that Ryder Scott had estimated its proved reserves in the Guaduas Oil Field at 47.6 million barrels of oil, having a discounted net present value of $272.3 million. The decrease in the present value was due principally to a 26% reduction in the price of oil on December 31, 2001 versus the price of oil on December 31, 2000. Even with this decrease in the value, however, an investment in the Notes still looked attractive

because even with these lower figures Seven Seas still held reserves whose value was greater than the debt owed by Seven Seas, even including the $45 million of Secured Notes.

28.     In reliance upon the figures provided in Ryder Scott's proved reserves report as set forth in Seven Seas' 10-K for year-end 2001, on April 18, 2002, Plaintiffs purchased additional interests in Seven Seas' 12.5% Notes in the following amounts:

| | |
|---|---|
| Pamco Cayman | $   2,000,000.00 |
| Pam Capital | $      500,000.00 |

**D.     Ryder Scott's Change In Reserve Estimates Sinks Plaintiffs' Investments In Seven Seas.**

29.     By July 2002, the Escuela No. 2 hit a depth of approximately 18,770 feet when it apparently contacted a new formation. While Seven Seas would not know for weeks whether the well would be producing oil in commercial quantities, there was typically a small likelihood of success due to the depth of the well and complications in the geology.

30.     That same month, Seven Seas announced that it was suspending further development drilling in the shallow reserves in the Guaduas Oil Field pending a reassessment of its recently drilled wells, its then-current production data, and the results of planned production enhancement efforts on its existing wells. On August 14, 2002, Seven Seas announced its results for the three-month and six-month periods which ended on June 30, 2002. Based upon a new reserve report provided by Ryder Scott, Seven Seas' proved reserves were revised downward to 16.3 million barrels. This represented a reduction in supposedly proved reserves of 31.3 million barrels of oil. The discounted net value of Seven Seas' total net proved reserves in the Guaduas Oil Field dropped from $272.3 million on December 31, 2001 to approximately $136 million on June 30, 2002 — even though oil prices on June 30, 2002 were higher than the prices on December 31, 2001. Thus, just four months after Ryder Scott had allowed Seven Seas to publish its estimate that Seven Seas' total net proved reserves in the Guaduas Oil Field were 47.6 million barrels of oil, Plaintiffs saw Ryder Scott's estimated reserves reduced by an astounding 66%. With one stroke of Ryder Scott's pen, Plaintiffs saw approximately 31.3 million barrels of

supposedly proved reserves simply disappear. And when those proved reserves disappeared, so did Plaintiffs investments in the Notes.

31.     Following Ryder Scott's dramatic downward revision of Seven Seas' proved reserves, Seven Seas was no longer able to meet its financial obligations. On September 19, 2002, a meeting was held between the management of Seven Seas and representatives of a group of investors who had purchased interests in the Notes. A question that was raised was the value of Seven Seas reserves remaining after the "writedown." In response, Seven Seas' management produced statistics for the market value of oil in the ground and stated that, assuming a reasonable value of $3 per barrel, Seven Seas' producing assets were worth around $49 million. They further stated that the debt owed on the Secured Notes was approximately $52 million. In other words, as of September 2002, the purchasers of the Secured Notes had been allowed the ride the potential upside of the Escuela No. 2 wildcat well, and after it did not pan out, they were to receive back their entire investments with interest. In contrast, the purchasers of the 12.5% notes were left with virtually nothing. It was almost as if the purchasers of the Secured Notes, all of whom were insiders or connected to insiders, had had perfect information regarding the true value of Seven Seas reserves back in July 2001 with the Secured Notes were initially issued.

32.     On December 20, 2002, Seven Seas was filed into an involuntary Chapter 7 bankruptcy.

## VI.

## CLAIMS

**A.    Count One: Negligent Misrepresentation.**

33.     Plaintiffs reallege and incorporate all allegations set forth above.

34.     Ryder Scott's representations regarding its reserve estimates for Seven Seas' total net proved reserves in the Guaduas Oil Field, as described above, constituted representations made by Ryder Scott in the course of its business.

35.    Ryder Scott owed a duty to Plaintiffs to use reasonable care and/or competence in obtaining and/or calculating and/or communicating the information which constituted Ryder Scott's reserve estimates for the Guaduas Oil Field because, under the business practices at the time of the subject transactions, Plaintiffs were: 1) part of a limited group of persons for whose benefit and guidance Ryder Scott intended to supply its reserve estimates for the purposes of being relied upon in making business decisions, or 2) part of a limited group of persons for whom Ryder Scott knew or should have known Seven Seas intended to supply with Ryder Scott's reserve estimates for the purpose of being relied upon in making business decisions. The "limited group" to which Plaintiffs belonged consisted of the discreet number of financial institutions who would potentially invest in high-yield investments such as those involved in this lawsuit. The "limited group" also consisted of existing investors in the Notes after such time that a Plaintiff had made in investment in the Notes.

36.    Ryder Scott failed to use reasonable care and/or competence in obtaining and/or calculating and/or communicating the information which constituted Ryder Scott's reserve estimates for Seven Seas' total net proved reserves in the Guaduas Oil Field.

37.    As a result of Ryder Scott's failure to use reasonable care and competence in obtaining and/or calculating its reserve estimates for Seven Seas' total net proved reserves in the Guaduas Oil Field, Ryder Scott supplied "false information" to Plaintiffs for the guidance of Plaintiffs in Plaintiffs' business decisions.

38.    Plaintiffs justifiably relied upon the reserve estimates supplied by Ryder Scott for Seven Seas' total net proved reserves in the Guaduas Oil Field and such justifiable reliance was the proximate cause of the pecuniary loss suffered by Plaintiffs, as described above.

39.   Thus, because of Ryder Scott's negligent misrepresentations, Plaintiffs have lost almost all of their investment in over $17.5 million worth of the Notes, for which loss Plaintiffs now sue.

40.   Additionally, because the misrepresentations made by Ryder Scott were so grossly negligent as to constitute reckless disregard for truth and/or fraud, Plaintiffs also seek an award of exemplary damages.

**B.   Count Two:  Common Law Fraud**

41.   Plaintiffs reallege and incorporate the allegations set forth above.

42.   The information contained in Ryder Scott's reserve estimate reports for Seven Seas contained material misrepresentations and omissions of fact.

43.   Ryder Scott knew that the information regarding Seven Seas' proved reserve estimates was false or that the representations contained in these reserve reports were made with reckless disregard as to its truth.  Ryder Scott also knew that the representations and omissions relating to their reserve estimates for Seven Seas were material.

44.   Ryder Scott made the foregoing misrepresentations and omissions with the intention that potential investors and existing investors in the Seven Seas Notes would act and rely upon those material misrepresentations and omissions.

45.   Plaintiffs relied upon the material misrepresentations and omissions contained in reserve reports for the Seven Seas issued by Ryder Scott.  Plaintiffs' reliance upon the material misrepresentations and omissions contained in Ryder Scott's reserve reports was the proximate cause of the damages sustained by Plaintiffs as described in this Plaintiffs' First Amended Original Petition.

46.     Because the actions by Ryder Scott which resulted in the harm for which Plaintiffs are seeking recovery were committed knowingly and intentionally and were fraudulent, Plaintiffs also seek to recover exemplary damages.

C.     **Count Three:   Civil Liability As An "Aider" Under Art. 581-33(F)(2) of Texas Revised Civil Statutes.**

47.     Plaintiffs reallege and incorporate the allegations set forth above.

48.     Plaintiffs purchased interests in the Seven Seas Notes in the amounts and on the dates set forth above.  The interests in the Seven Seas Notes constitute "securities" as that term is defined in Art. 581-4 (A) of Texas Revised Civil Statutes.

49.     Pursuant to Art. 581-33 (F)(2) of Texas Revised Civil Statutes, Ryder Scott is civilly liable as an aider of fraud in the sale of a security in that Ryder Scott directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aided the issuer of a security (i.e., Seven Seas).

50.     The misrepresentations and/or omissions contained in the reserve reports prepared by Ryder Scott were material to Plaintiffs' acquisitions of the interests in the Seven Seas' Notes as described herein.

51.     As a result of Ryder Scott's material misrepresentations and/or omissions, Plaintiffs have suffered damages as set forth above.

52.     All conditions precedent to Plaintiffs bringing their claims against Ryder Scott have been performed or have occurred.

53.     Because the harm with respect to which Plaintiffs are seeking recovery resulted from fraud, Plaintiffs also seek an award of exemplary damages.

54.     Plaintiffs also request that the Court award Plaintiffs their reasonable attorneys' fees because such an award would be equitable under the circumstances presented by this case.

**D.**   **Count Four:  Conspiracy To Defraud.**

55.   Plaintiffs reallege and incorporate the allegations set forth above.

56.   Chesapeake Energy, Hefner, and Seven Seas entered into a common plan, scheme or design to defraud investors in the Seven Seas Notes, including Plaintiffs, by issuing and purchasing the Secured Notes, as described above, in order to decrease the assets available to investors in the Notes.  Chesapeake Energy, Hefner and Seven Seas accomplished this fraud by employing the material misrepresentations and/or omissions contained in Ryder Scott's reserve reports in order to induce potential investors and existing investors in Seven Seas Notes, including Plaintiffs, to either acquire interests in such Notes or to refrain from selling interests in such Notes.  Chesapeake Energy and Hefner knew that the misrepresentations and/or omissions contained in Ryder Scott's reserve estimates were false or had been made with reckless disregard as to their truth.

57.   Because the acts committed in furtherance of this conspiracy to defraud by Chesapeake Energy and Hefner were committed knowingly and intentionally, Plaintiffs also seek to recover exemplary damages.

**E.**   **Count Five:  Aiding And Abetting Fraud.**

58.   Plaintiffs reallege and incorporate the allegations set forth above.

59.   Chesapeake Energy and Hefner and Ryder Scott are also liable for all damages caused by the aforementioned fraudulent schemes because each of these Defendants was aware the conduct by Seven Seas constituted a breach of duty and gave substantial assistance or encouragement to the Seven Seas to continue with the scheme.

**VII.**

**JURY DEMAND**

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION**                                  PAGE 16

**R 25**

60.     Plaintiffs demand a jury on all issues.

### VIII.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant all of the relief requested herein and award:

1.      Actual damages for all losses suffered by Plaintiffs as shown by competent evidence at the time of trial;

2.      Exemplary damages as allowed under Texas law;

3.      Reasonable attorneys' fees as permitted under Texas law;

4.      Prejudgment and post-judgment interest at the highest rate(s) allowed by law;

5.      Costs of court; and

6.      Such further relief, at law or in equity, which this Court may deem just and proper and to which Plaintiffs may be entitled.

PLAINTIFF'S ORIGINAL PETITION   PAGE 17

**R 26**

Respectfully submitted,

LACKEY HERSHMAN, L.L.P.

By: *Edward J. Szymanski Jr.*
Paul B. Lackey
State Bar No. 00791061
Michael P. Aigen
State Bar No. 24012196
Edward J. Szymanski, Jr.
State Bar No. 19599700

3102 Oak Lawn Avenue
Suite 700
Dallas, Texas 75219-4241
Telephone:    (214) 560-2201
Telecopier:   (214) 560-2203

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November, 2003, a true and correct copy of the foregoing document was served upon counsel of record for Defendant Ryder Scott Company by facsimile transmission.

*Edward J. Szymanski Jr.*
Edward J. Szymanski, Jr.



# The State of Texas

Citations Unit
P.O. Box 12079
Austin, Texas 78711-2079

Phone: 512-463-5560
Fax: 512-463-6616
TTY (800) 735-2989
www.sos.state.tx.us

## Secretary of State

February 3, 2004

Chesapeake Energy Corporation
6100 N Western Avenue
Oklahoma City, OK 73118

RECEIVED
FEB 0 2004
MAILROOM

2004-089405-1
Include reference number in
all correspondence

RE:  Highland Capital Management L P VS Ryder Scott Company
     234th Judicial District Court Of Harris County, Texas
     Cause No: 200339194

Dear Sir/Madam,

Pursuant to the Laws of Texas, we forward herewith by CERTIFIED MAIL, return receipt
requested, a copy of process received by the Secretary of State of the State of Texas on
January 29, 2004.

CERTIFIED MAIL #71603901984809485439

Refer correspondence to:

Edward J. Szymanski
Lackey Hershman
3102 Lawn Avenue
Suite 700
Dallas, TX 75219-4241

Sincerely,

Helen Lupercio
Supervisor, Citations Unit
Statutory Documents Section

hl/vb
Enclosure

R 28

CAUSE NO. 200339194

|                        | RECEIPT NO. | 0.00 | ATY |
|---|---|---|---|
|                        | ********** |  | TR # 71754305 |

PLAINTIFF: HIGHLAND CAPITAL MANAGEMENT L P
    vs.
DEFENDANT: RYDER SCOTT COMPANY

In The 234th
Judicial District Court
of Harris County, Texas
234TH DISTRICT COURT
Houston, TX

CITATION (SECRETARY OF STATE FOREIGN CORPORATION)

THE STATE OF TEXAS
County of Harris

RECEIVED
SECRETARY OF STATE
JAN 29 2004
2:30 PM
CITATIONS UNIT

TO: CHESAPEAKE ENERGY CORPORATION (OKLAHOMA CORPORATION) BY SERVING THE
    TEXAS SECRETARY OF STATE 1019 BRAZOS STREET AUSTIN TEXAS 78701
    FORWARD TO
    6100 N WESTERN AVENUE  OKLAHOMA CITY OK 73118

Attached is a copy of PLAINTIFFS' FIRST AMENDED PETITION

This instrument was filed on the 21st day of November, 2003, in the above cited cause number
and court. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a
written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday
next following the expiration of 20 days after you were served this citation and petition,
a default judgment may be taken against you.

TO OFFICER SERVING:
This citation was issued on 8th day of January, 2004, under my hand and
seal of said Court.

Issued at request of:
SZYMANSKI, EDWARD J. JR.
3102 OAK LAWN AVE700
DALLAS, TX 75219
Tel: (214) 560-2201
Bar No.: 19599700

CHARLES BACARISSE, District Clerk
Harris County, Texas
301 Fannin      Houston, Texas 77002
(P.O. Box 4651, Houston, Texas 77210)

BY
Deputy GILLESPIE, JACQUELYN 2MA//6788433

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at _____ o'clock ____ .M., on the _____ day of _____, _____.

Executed at (address) _____ in

_____ County at _____ o'clock _____.M., on the ____ day of _____,

_____, by delivering to _____ defendant, in person, a
true copy of this Citation together with the accompanying _____ copy(ies) of the
    Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.
To certify which I affix my hand officially this _____ day of _____, _____.

Fee: $_____                    _____

                       _____ of _____ County, Texas

_____          By _____
      Affiant                              Deputy

On this day, _____, known to me to be the person whose
signature appears on the foregoing return, personally appeared . After being by me duly sworn,
he/she stated that this citation was executed by him/her in the exact manner recited on the
return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this _____ day of _____, _____.

_____
      Notary Public

N.INT.SECC.P                                                    R 29